# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **WESTERN WATERSHEDS PROJECT,**<br><br>**Plaintiff,**<br>vs.<br><br>**H. DALE HALL, Director, United States Fish and Wildlife Service; and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States,**<br><br>**Defendants.** | Case No. CV 06-0073-S-EJL<br><br>**MEMORANDUM ORDER** |

Before the Court in the above entitled matter are the Plaintiff's motion for summary judgment and the Defendants' cross-motion for summary judgment. The parties have submitted their briefing on the motions and the matters are now ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument. Local Rule 7.1(d)(2)(ii).

**Factual and Procedural Background**

Plaintiff Western Watersheds Project ("Western Watersheds") filed the instant action challenging the "90-Day Finding" issued by the Defendants United States Fish and Wildlife Service and H. Dale Hall, Director, United States Fish and Wildlife Service (collectively referred to as "the Service"). (Dkt. No. 1). The 90-Day Finding denied Western Watersheds' Listing Petition

("Petition") seeking protection of the Interior Mountain Quail as endangered or threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*.

The Petition presented to the Service alleged that the Interior Mountain Quail is a Distinct Population Segment ("DPS") qualifying for ESA protection due to its declining population and habitat in the Interior Columbia Basin and Great Basin region of the Interior West; specifically, east of the Cascade Crest in Washington and Oregon, historically occupied portions of western Idaho, and historically occupied portions east of the California/Nevada border south to the proximate vicinity of the Palmetto Mountains of southwestern Nevada. The Service determined that the Petition had failed to provide information demonstrating that the Interior Mountain Quail population is discrete under the ESA. Western Watersheds alleges the Service's conclusions are arbitrary, capricious, and contrary to law and seeks reversal of the 90-Day Finding and remanding of the matter directing the Service to proceed with the ESA listing process.

**Standard of Review**

1)   Summary Judgment:

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997). Federal Rule of Civil Procedure 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

MEMORANDUM ORDER
07ORDERS\WesternWatersheds_SJ

British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted).  Of course, when applying the above standard, the court must view all of the evidence in a light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

2)     Administrative Review:

Compliance with ESA is reviewed under the APA.  See Northwest Ecosystem Alliance, et al. v. Rey, et al.,380 F.Supp.2d 1175, 1184 (W.D. Wash. 2005) (citations omitted); 5 U.S.C. § 706(2)(A).  The APA provides that an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Northwest Ecosystem Alliance v. United States Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)).  An agency decision is arbitrary or capricious if:  1) the agency entirely failed to consider an important aspect of the issue; 2) the agency offered an explanation for its decision that was counter to the evidence before it; 3) the agency relied on factors that Congress did not intend for it to consider; or 4) the agency's decision is so implausible that it could not be ascribed to the product of agency expertise.[1]  Northwest Ecosystem, 380 F.Supp.2d at 1184.

"This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"  Northwest Ecosystem, 475 F.3d at 1140 (quoting Independent Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000) (citations omitted)).  In making this determination, the Court "may not consider information

---

[1] "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).

outside of the administrative record... and may not substitute our judgment for that of the agency." Id. (citations and quotations omitted). "Our task is simply to ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." Id. (citations and quotations omitted); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (The reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."). "Within this narrow review, [the court] cannot substitute [its] judgment for that of the [agency], but instead must uphold the agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the facts found and the choice made." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 954 (9th Cir. 2003) (citation omitted).

## Analysis

The ESA was enacted "to provide a program for the conservation of...endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Whether a particular species should be listed as either "endangered" or "threatened" is determined by the process set forth in Section 4 of the ESA, 16 U.S.C. § 1533.[2] This listing may occur upon the Secretary's own initiative or in response to a petition filed by an interested person.[3] 16 U.S.C. § 1533(b)(3)(A). Where such a petition is filed, the Service must "[t]o the maximum extent

---

[2] An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

[3] The term "Secretary" can refers to either the Secretary of the Interior or the Secretary of Commerce depending on the species in question; in this case the Secretary of the Interior has jurisdiction. The Secretary has delegated this authority to the Service and the Director.

practicable, within 90 days after receiving the petition of an interested person...make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). "Substantial information" is the "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b).

Where such a 90-Day Finding agrees with the petition, the Secretary must undertake a status review of the species and, within one year, issue a "12-month Finding" concluding whether the petition is warranted, not warranted, or warranted but precluded. 16 U.S.C. § 1533(b)(3)(B). Where, as here, the 90-Day Finding is negative as to the petition's request, the listing or delisting process is at an end and the aggrieved party may seek judicial review of the Secretary's decision. 16 U.S.C. § 1533(b)(3)(C)(ii).

Here, Western Watersheds filed a Petition "to list the indigenous mountain quail (*Oreortyx pictus*) of the northern and western Great Basin and the Interior Columbia Basis and lands westward to the Cascade Crest as threatened or endangered pursuant to the [ESA], and to designate critical habitat concurrent with its listing." (AR 2055). The Service's 90-Day Finding concluded the population was not discrete and, therefore, not eligible for listing under the ESA, stating that the Petition

> does not present substantial information to indicate that the petitioned action is warranted. This finding is based on the following: (a) Insufficient information exists to enable us to determine whether the mountain quail in the proposed DPS are separated from other mountain quail throughout the range of the taxon; (b) complicating information about past translocations of mountain quail currently precludes clearly determining the native historical distribution of the species; and (c) evidence is insufficient to demonstrate that genetic, morphological, ecological, or behavioral differences exist among extant mountain quail populations.

(AR 005). Western Watersheds challenges this finding alleging the Service misapplied the legal standards of the ESA in three ways: 1) the Service imposed a higher standard of scientific proof; 2) the Service improperly required complete separation between the Interior and other Mountain

Quail populations; and 3) the Service considered only whether the population was threatened or endangered across the entirety of its range and not over a significant portion of its range. (Dkt. No. 21, p. 2-3). The Service counters that it applied the appropriate standard when determining that the Petition failed to present substantial scientific or commercial information indicating that the Interior Mountain Quail population was discrete from the remainder of the species' range in California, western Oregon, and Washington. (Dkt. No. 28, P. 2).

In order to qualify as a DPS, a population must "be both discrete and significant." Northwest Ecosystem Alliance, 475 F.3d at 1142. "The purpose of the discreteness standard is to ensure that a DPS is adequately defined and described, allowing for the effective administration of the ESA. This standard distinguishes a population from other members of its species, but does not require absolute separation." National Ass'n of Home Builders v. Norton, 340 F.3d 835, 842 (9th Cir. 2003) (citation omitted). "A population is discrete if (1) '[i]t is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors'; or (2) '[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.'" Id. (citation omitted). The second condition is not at issue here, thus the question in this case is whether the Petition provided "substantial scientific or commercial information indicating that" the Interior Mountain Quail is markedly separated from other populations of the same taxon to be considered discrete and therefore that the requested DPS is warranted

To establish discreteness, the Petition points to geographic and ecological factors. (AR 2079-80). As to the geographic factors, the Petition states that the Mountain Quail is separated from populations in the costal areas by "large expanses of highly fragmented, unsuitable habitat," "broad continuous bands of habitat," or "the ridges of the Cascade Mountains." (AR 2080). The

Petition notes that the species only exist in "disjunct, island populations in remnant habitats" and that these "island populations may be isolated from one another" and "may now be almost entirely cut off from genetic exchange" with other mountain quail due to the lack of proper migration and dispersal corridors between the fragmented populations. (AR 2080). As such, the Petition seeks to link these isolated populations to allow migration and genetic interchange between them in order to preserve the species. Thus, the Petition concludes, "Mountain quail within the area subject to this petition are now isolated, and therefore discrete." (AR 2081).

In evaluating the physical separation from the rest of the taxon, the Service concluded that Western Watersheds "did not provide substantial information...to demonstrate that the populations of mountain quail along the western border of the proposed DPS are physically isolated from nearby eastern populations in Oregon and Nevada." (AR 004). In making this determination the Service pointed to the fact that while the species is associated with separate locations within the proposed DPS on various ranges, the species may move between the areas and no physical barrier precludes any such movement of the birds across the proposed DPS to lands outside of the proposed DPS. (AR 004) ("there is a blend of both disjunct populations and continuous populations areas that do not meet the discreteness standard under our DPS policy."). The Service noted the fact that the Mountain Quail has both disjunct populations but also populations that intermix over the boundaries proposed in the Petition. This mixing, the Service concluded, cuts against the Petition's contention that the Interior Mountain Quail is distinct from Mountain Quail located outside of the proposed DPS. Western Watersheds argues that the mere possibility that the Interior Mountain Quail could intermix with other populations is an insufficient basis upon which to deny the Petition and argues this finding improperly required absolute separation between the Interior and other Mountain Quail populations. See National Ass'n of Home Builders, 340 F.3d at 842.

The Court disagrees that the Service improperly required absolute separation. The Service's decision turned not on whether some intermixing is possible but, instead, on the fact that the proposed DPS boundaries delineated in the Petition contain "a blend of both disjunct populations and continuous populations that do not meet the discreteness standard...." (AR 004). It is the petitioner's burden to provide the Service with the necessary "substantial scientific or commercial information." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b). Such information as to discreteness was not provided here. The Petition's claim that the species exists "only as disjunct, island populations" is supported by two citations to authorities, Brennan 1989 and Pope pers. comm. 1999, and an attached map representing possible Idaho population locations. The remainder of the Petition's discussion on this point contains no citations to authority. The discreteness requirement exists to "ensure that a DPS is adequately defined and described, allowing for the effective administration of the ESA" and requires that a petition "distinguishes a population from other members of its species." National Ass'n of Home Builders, 340 F.3d at 842. The Service's conclusion appropriately determined that this discreteness standard was not met and it provided a rational basis for concluding the Petition had failed to provide evidence of a marked separation between the populations of the same taxon. (AR 1216).

On this point, however, the Service cites a study by Pope and Crawford (2001). The Service later sought specific information from Pope as to the movement of Mountain Quail over the Cascade Crest. (AR 1045). Pope responded by concluding that these populations could migrate over the Cascade Crest. (AR 1045). Western Watersheds argues this response by Pope was improperly relied upon by the Service as it failed to cite any specific information supporting the conclusion and it violates ESA procedure as a solicitation by the Service for information to refute the petition without providing the public an opportunity to respond to Pope's conclusions and information. (Dkt. No. 29, p. 7). The Service concedes that it should not have considered this

information as it was not made subject to public review but couches the personal contact with Pope as "clarifying or investigating sources cited in a petition" and notes that Western Watersheds had also cited to Pope's article in its Petition. (Dkt. No. 28, p. 22 n. 10 and Dkt. No. 30, p. 7). The ultimate finding, the Service argues, is supported regardless of the Pope communication.

Western Watersheds challenges this improper reliance on the Pope response by citing to recent district court opinions Colorado River Cutthroat Trout v. Dirk Kempthorne, 448 F.Supp.2d 170, 175-76 (D.D.C. 2006) and Center for Biological Diversity v. Morgenweck, 351 F.Supp.2d 1137 (D. Colo. 2004). In both of those cases the district courts determined that while engaging in its review of plaintiffs' petition at the 90-day stage the Service improperly solicited opinions from state and federal agencies and relied upon those solicited opinions in denying the petitions. Those courts reasoned that by considering information outside of the four corners of the petitions impermissibly expanded the scope of the 90-day review noting that the Service's obligation at the 90-Day stage is "to make a threshold determination as to 'whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.'" Colorado River, 448 F.Supp.2d at 176 (citing 16 U.S.C. § 1533(b)(3)(A)); 50 C.F.R. § 424.14(b)(1)). "It does not authorize the [Service] to weigh the information provided in the petition against information selectively solicited from third parties. The [Service] simply cannot bypass the initial 90-day review and proceed to what is effectively a 12-month status review, but without the required notice and the opportunity for public comment." Id. "[P]etitions that are meritorious on their face should not be subject to refutation by information and views provided by selected third-parties solicited by [the Service]." Morgenweck, 351 F.Supp.2d at 1143 (citing 16 U.S.C. § 1533(b)(3)(A) (if "petition presents substantial scientific or commercial information that the petitioned action may be warranted ... the Secretary shall promptly commence a review of the status of the species concerned.")).

This Court finds the reasoning of both of these cases, while not binding, is persuasive. It was improper for the Service to make an outside solicitation or inquiry about the Petition and consider the responses when making its 90-Day Finding. Colorado River, 448 F.Supp.2d at 177 ("Both the statute setting forth the 90-day review requirements, 16 U.S.C. § 1533(b)(3)(B), and its implementing regulation, 50 C.F.R. § 424.14(b), make plain that the 90-day review is to be based on the petition alone or in combination with the [Services] own records."). The statutory purpose at the 90-Day stage is to render a threshold determination of whether the petition has offered substantial scientific or commercial information indicating that the requested action may be warranted. See 16 U.S.C. § 1533(b)(3)(A). As such, the Services personal communication with Pope was improper, particularly since the public was not given a chance to respond.

That being said, the Court concludes the facts of this case are distinct from those in Colorado River and Morgenweck. In both of those cases the Service made several inquiries from multiple agencies in making its 90-Day determination. In Morgenweck the court described the Service's efforts as "a targeted information campaign, begun only after the Petition had been filed, was improper." Morgenweck, 351 F.Supp.2d at 1143. Here, the Service made a single inquiry of a source that was cited in the Petition and the response received was brief. Further, the Service in this case cited to other authorities supporting its decision that there was insufficient information in the Petition to conclude that the Mountain Quail did not move from east to west and west to east along the Cascade Crest in Oregon and were therefore isolated and distinct.

More importantly, even if the Service's conclusion that the Mountain Quail could move through the proposed DPS boundaries is not considered, the Service's denial of the Petition based on its failure to demonstrate that the Interior Mountain Quail is a distinct species based on the other

discreteness factors is otherwise supported in the record.[4]  Ultimately concluding that "No information is presented in the petition, nor is any available in Service files, to indicate that any physical, genetic, behavioral, morphological, physiological, or ecological differences between mountain quail that occur in the proposed DPS and those found outside of it."  (AR 005).

The Petition points to ecological factors that make the Mountain Quail discrete such as: the specie's "dependence on riparian habitats that occur in a linear configuration" on a macrohabitat scale and the physical and environmental impact upon the species resulting in a discrete ecological setting.  (AR 2079-80).  The Petition argues the "drastically different" habitats occupied by the Interior Mountain Quail as establishing ecological discreteness.  This factor, the Service argues, is "relevant only to the extent that it serves to create marked separation between a proposed DPS and the remainder of the taxon."  (Dkt. No. 30, p. 5).  Here, the Service maintains that the ecological factors, and information cited, in the Petition fails to demonstrate a marked distinction between the proposed DPS and the remainder of the taxon.  (Dkt. No. 30, p. 5- 6).  The 90-Day Finding discussed the varied habitat in which Mountain Quail have been located but notes that the varied habitat does not support a finding of a discrete population and the sources cited by the Service cut against such a finding.  (AR 002).

The 90-Day Finding also points out that the "petitioners did not provide evidence to document whether mountain quail within the proposed DPS exhibit any unique behavioral or morphological traits."  (AR 005).  Regardless, the Service evaluated the behavioral and morphological factors and concluded that the species lacked distinctiveness from the remainder of the taxon.  The study referenced in the 90-Day Finding, Delehanty (1997), considered the behavioral displays of the species as between the sexes based upon birds from various areas both

---

[4] The DPS Policy discreteness factors include: physical, physiological, ecological, and behavioral. (AR 1216).

inside and outside the proposed DPS. This study concluded that many behavioral displays are universal to both sexes but some displays are particular to only males. The Service concludes that this study demonstrates "that behavioral and morphological aspects are not limiting factors in reproduction when translocation is considered." (AR 005).

The historical documented translocation of Mountain Quail, the Service stated, further complicates the discreteness question as may have lead to genetic homogenization of Mountain Quail. The Service notes that there are "no comprehensive genetic evaluations for discreteness of Mountain Quail rangewide or within the proposed DPS" and that the unpublished data cited in the Petition indicates there are no genetic differences among Mountain Quail. (AR 005). The Service also stated that the native range of the species is difficult to identify when considering the history of translocations. (AR 005). Western Watersheds argues the Service improperly considered only whether the population was threatened or endangered across the entirety of its range and not over a significant portion of its range. The Court concludes that these findings by the Service are not arbitrary, capricious, or contrary to law. The Service considered the relevant facts and reached a reasonable conclusion based on the information before it.

As noted above, the discreteness requirement exists to "ensure that a DPS is adequately defined and described, allowing for the effective administration of the ESA" and requires that a petition "distinguishes a population from other members of its species." National Ass'n of Home Builders, *supra*. The Service's 90-Day Finding is based on several discreteness factors[5] which support its conclusion that the Petition did not provide information demonstrating a marked separation from other populations of the same taxon to support a threshold determination that the Interior Mountain Quail is discrete. After reviewing the record, findings, supporting material,

---

[5] The DPS Policy discreteness factors include: physical, physiological, ecological, and behavioral. (AR 1216).

MEMORANDUM ORDER
07ORDERS\WesternWatersheds_SJ

12

administrative record, and the parties arguments, the Court finds the Service's properly considered all of the relevant factors and articulated a rational connection between the facts found and the ultimate conclusion made in this case.  Having found the Petition failed to show sufficient information or evidence of discreteness, the Service was not required to determine the Mountain Quail's significance within the species to which it belongs because without finding discreteness, Petition is denied.  See DPS Policy (AR 1216).[6]

## ORDER

Based on the foregoing and being fully advised in the premises, the Court HEREBY ORDERS as follows:

1) Plaintiff's Motion for Summary Judgment (Dkt. No. 21) is **DENIED**.

2) Defendants' Cross-Motion for Summary Judgment (Dkt. No. 27) is **GRANTED** and this case is **DISMISSED IN IT ENTIRETY**.

DATED: **September 24, 2007**

Honorable Edward J. Lodge
U. S. District Judge

---

[6] Three elements are considered in a decision regarding the status of a possible DPS as endangered or threatened under the Act: 1. Discreteness of the population segment in relation to the remainder of the species to which it belongs; 2. The significance of the population segment to the species to which it belongs; and 3. The population segment's conservation status in relation to the Act's standards for listing.